IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| BEVERLY MINTON, | : |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| DALE S. GUYER, et al., | : |
| | : |
| Defendants. | : |

:     CIVIL ACTION

:     NO. 12-6162

MEMORANDUM

YOHN, J.                                                                                    May 7, 2014

      Beverly Minton brings an action pursuant to 42 U.S.C. § 1983 against Correctional

Officer Dale S. Guyer, Warden D. Edward McFadden, and Chester County, claiming violations

of her Eighth Amendment and Fourteenth Amendment rights stemming from sexual encounters

between Minton and Guyer while she was incarcerated at the Chester County Prison.  Before me

is McFadden and Chester County's ("defendants") motion for summary judgment, the plaintiff's

response, and the defendants' reply.  For the following reasons, I will grant the defendants'

motion in part and deny in part.

## I. FACTUAL AND PROCEDURAL HISTORY

### A.  Factual background of the alleged constitutional violations

      From, at least, October 30, 2010 through December 7, 2010, Minton was incarcerated at

the Chester County Prison Work Release Center following her conviction for driving under the

influence.  (Mot./Resp. ¶¶ 1, 2, 12.)  The Work Release Center is a low security detention facility

located on Chester County Prison property in a building detached from the main detention

facility.  (Mot./Resp. ¶ 1.)  Corporal Dale Guyer was a Chester County Prison correctional

officer assigned to the Work Release Center for the 8:00 AM to 4:00 PM shift on October 30 and 31, 2010.  (Mot./Resp. ¶ 3.)  On those dates, Minton and Guyer engaged in sexual intercourse in the basement of the Work Release Center.  (Mot./Resp. ¶ 4.)  The parties agree that the sex was not physically forced and that Minton was a "willing participant."  (Mot./Resp. ¶¶ 5, 7.)  During her time at the Work Release Center, Minton never reported the sexual encounters to any prison official.  (Mot./Resp. ¶ 11.)  Following her release from Chester County Prison on December 7, 2010, Minton continued her sexual relationship with Guyer through the beginning of February 2011.  (Mot./Resp. ¶¶ 13, 14.)

On or about November 10, 2010, Chester County Prison officials learned that Guyer was "engaging in excessive conversation" with female inmates.  (Mot./Resp. ¶ 32.)  In response, prison officials initiated an investigation and reassigned Guyer from the Work Release Center to the main housing unit for his upcoming shifts on November 11 and 12, pending the outcome of the investigation.  (Mot./Resp. ¶ 33.)  Without authorization, Guyer altered his reassignment, placing himself back at the Work Release Center for the November 11 and 12 shifts. (Mot./Resp. ¶ 34.)  On November 12, 2010, Guyer took leave from his employment with the Chester County Prison under the Family Medical Leave Act.  (Mot./Resp. ¶ 36.)  Shortly thereafter, Guyer was terminated from his employment with Chester County Prison for giving Minton a Walkman in violation of prison policy, and for altering his November 11 and 12 shift assignment to the main detention unit.  (Mot./Resp. ¶ 37.)  As the plaintiff notes, Guyer's employment was not terminated for his sexual relationship with Minton.  (Resp. ¶ 8, 28.)  And after he was terminated, he was later permitted to resign and collect his full pension.  (Resp. ¶¶ 8, 37.)

**B. Guyer's disciplinary background at Chester County Prison**

Plaintiff alleges that Guyer had two disciplinary issues at Chester County Prison prior to the events that give rise to this case. The first incident, in 2004, stemmed from an extra-marital affair with a nurse, employed by a private health care provider, who was working as a contract employee at Chester County Prison. (Resp. Ex. Q; McFadden Dep. 53:6-9.) According to the nurse, when she attempted to end the relationship, Guyer verbally abused and threatened her. (Resp. Ex. Q.) She allegedly reported this harassment to McFadden, who was deputy warden at the time, and was told that she "better just learn to ignore" Guyer. (Resp. Ex. Q.) Thereafter, she left her position at Chester County Prison. (Resp. Ex. Q.) In his deposition, while McFadden recalls that the nurse filed a complaint with the prison, he states that he never personally spoke to her regarding the matter. (McFadden Dep. 51:17-52:4.) Guyer received a written warning from prison officials following this incident, but was not otherwise disciplined. (Guyer Dep. 41: 5-6.) Furthermore, the plaintiff alleges that, as of 2007, the incident was not a part of Guyer's formal record. (Pl.'s Mem. 6; Resp. Ex. J.)

The second incident, in 2005, stemmed from Guyer's attempt to exercise authority, which he did not enjoy, over a subordinate female correctional officer. (Resp. Ex. H.) This disciplinary report does not suggest any sexual impropriety toward the correctional officer. (Pl. Resp. Ex. H.) Following this incident, Guyer was required to attend the County's Employee Assistance Program with the Human Management Services. (Resp. Ex. H.) Guyer recalls attending the ordered counseling "once…maybe twice" where he was "basically remind[ed] how a supervisor would be able to handle subordinates under them." The defendants do not appear to dispute the truthfulness of these allegations, though they do challenge their relevance to plaintiff's claims. (Reply 2-3, 4-5.)

**C.  Chester County Prison policy and training regarding sexual relationships between correctional officers and inmates**

The parties agree that Chester County Prison provides correctional officers with written General Personnel Orders and a Correctional Officers Handbook which, among other things, prohibits any personal or sexual relationships between inmates, or former inmates, and correctional officers, including inmates and correctional officers at the Work Release Center, and that Guyer was provided a copy of this policy.  (Mot./Resp. ¶ 21, 22; Mot. Exs. F., at ¶ 30, H, at 27.)  The parties disagree that Chester County Prison correctional officers, generally, and Guyer, specifically, were trained regarding the policy.  (Mot./Resp. 23-25.)  In his deposition testimony, Guyer stated that, upon first being hired in 1985, his basic training consisted entirely of "range qualification" and "working the block" which exposed him to the "basic knowledge of what the other officers were exposed to," and that he received no training on inappropriate or sexual relationships with inmates.  (Guyer Dep. 14:16-15:12.)  About a year after he was first employed by Chester County Prison, Guyer attended an academy where he received training, including training on excessive use of force, cruel and unusual punishment, and self-defense techniques, but he, again, says he did not receive training about whether or not it was appropriate to engage in sexual relations with an inmate.  (Guyer Dep. 18:6-22.)  And, following the academy, Guyer stated that he received further training on CPR, first aid, self-defense tactics, radio communications, and fire suppression, but no training on laws regarding interactions between correction officers and inmates.  (Guyer Dep. 18:23-19:8.)  For summary judgment purposes I must accept his version of these facts.

However, Guyer also stated in his deposition that he recalled being "told" by Chester County Prison officials that it was against prison policy to enter into "personal and/or sexual relations with any inmate," and that "contact of a sexual nature [was] absolutely prohibited."

4

(Guyer Dep. 56:22-57:19.)  Guyer acknowledged he received an officer's handbook that provided that "entering into personal and/or sexual relationships with any inmate" or former inmate was prohibited, and that he was "taught" the same by the prison.  (Guyer Dep. 128:5-22.) Guyer further stated that he was "taught" by the prison that engaging in "sexual relationships with an inmate is never consensual."  (Guyer Dep. 129:20-23.)  It is not clear when Guyer received this information as, according to his prior deposition testimony, it was not a part of his official training as a correction officer.

According to the plaintiff's expert, John G. Peters, Jr., Ph.D., Chester County Prison failed to develop an objective, performance-based training program regarding its policies and procedures, laws, or inmates' constitutional rights.  (Resp. Ex. R., at 8-12.)  Further, while Guyer stated in his deposition that he knew that sexual contact between correctional officers and inmates was against Chester County Prison policy, the evidence did not show that Guyer's training was complete, objective, and measurable.  (Resp. Ex. R., at 8, 9.)  According to the expert, Chester County Prison failed to instruct Guyer that engaging in sexual relationships with inmates violated the inmates' constitutional rights.  (Resp. Ex. R., at 8.)  The expert further noted that Chester County Prison failed to instruct Guyer that engaging in even unforced sexual intercourse with an inmate is a criminal violation and that, doing so, would expose him to potential incarceration. [1]  (Resp. Ex. R., at 9; Guyer Dep. 125:24-126:16; 130:1-5.)  And McFadden, himself, confirmed that correctional officers at Chester County Prison are not specifically instructed that engaging in unforced sexual relations with inmates constitutes a criminal violation under Pennsylvania law. (McFadden Dep. 63:23-64:4.)

---

[1] Pennsylvania law provides in relevant part that "a person who is an employee or agent of the Department of Corrections or a county correctional authority…commits a felony of the third degree when that person engages in sexual intercourse, deviate sexual intercourse or indecent contact with an inmate, detainee, patient or resident."  18 Pa. C. S. § 3124.2(a)

**D.  Chester County Prison policy regarding supervision of inmates**

Finally, Minton alleges that, while the main detention facility at Chester County Prison had a policy that prohibited male correctional officers from supervising female inmates, the Work Release Center had no such policy.  (Resp. ¶ 26.)   Accordingly, male correctional officers were permitted to supervise female inmates, as a matter of policy, at the Work Release Center. (Resp. ¶ 26.)  In his deposition, McFadden acknowledged that failing to segregate male correctional officers from female inmates "could create additional issues" that could result in "possible harassment cases," and was therefore "not good correctional professional policy." (McFadden Dep. 37:3-12.)  The plaintiff's expert witness likewise reports that "allow[ing] male guards to be alone and unmonitored with female prisoners" is "bad policy."  (Pl. Resp. Ex. R., at 14.)

**E.  Chester County Prison policy regarding pre-employment psychological evaluation**

The plaintiff further alleges that Chester County Prison did not require pre-employment psychological evaluations for its correctional officers.  In accordance with this lack of policy, Guyer did not undergo any psychological evaluations or testing when he was hired by Chester County Prison.  (Guyer Dep. 14:12-15.)  Further, Guyer testified that he was unaware of any policy that required him to notify prison officials if he was taking medication for any mental health conditions.  (Guyer Dep. 123: 6-9.)

At some point prior to the incident at issue in the present case, Guyer had been diagnosed with a mental health disorder.  (Pl's. Mem. 1; Guyer Dep. 122:12-14.)  According to the plaintiff's expert, Guyer also had a "long history of extra-marital affairs, disobeying policy and procedures, and engaging in deviant behavior." Resp. Ex. R., at 5.)  In his deposition, McFadden testified that he was unaware whether Guyer was under a psychiatrist's care or whether he was

taking medication for a mental health condition.  (McFadden Dep. 41:7-21.)  McFadden, however, acknowledged that this was information prison officials would want because "we need to be aware of where we have [correctional officers] placed for security reasons."  (McFadden Dep. 40:15-23; 41:19-21.)  And plaintiff's expert confirms that a "pre-employment psychological examination should have identified those propensities, and raised a 'red flag'" not to hire Guyer as a correctional officer.  (Resp. Ex. R., at 5.)

### F.  Procedural Background

On October 31, 2012, the plaintiff filed a complaint in which she brings two counts.  The first is a 42 U.S.C. § 1983 claim against Guyer for violation of her Eighth and Fourteenth Amendment rights.  The second is a 42 U.S.C. § 1983 claim against McFadden and Chester County, pursuant to *Monell*.

On October 15, 2013, the defendants Chester County and McFadden filed a motion for summary judgment.  Minton responded on December 30, 2013, and the defendants replied on January 20, 2014.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To establish that there is, or is not, a genuine dispute as to any material fact, a party may rely on "depositions, documents, electronically stored information, affidavits or declarations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  "Material facts are those that could affect the

outcome of the proceeding, and a dispute about a material fact is genuine if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Roth v. Norfalco, LLC*, 651 F.3d 367, 373 (3d Cir. 2011) (internal quotation marks omitted). Thus, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) "[W]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587 (quoting *First Nat'l Bank of Ariz. V. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)).

"In evaluating the motion, 'the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence.'" *Guidotti v. Legal Helpers Debt Resolution, LLC*, 716 F.3d 764, 772 (3d Cir. 2013) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "Summary judgment may not be granted...if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms, Inc. v. John Labatt*, Ltd., 90 F.3d 737, 744 (3d Cir. 1996) (internal quotation marks and citations omitted). "[A]n inference based upon a speculation or conjecture," however, "does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n. 12 (3d Cir. 1990).

## III. DISCUSSION

The defendants' motion for summary judgment raises two arguments. Defendants first challenge any claims stemming from the October 30, 2010 sexual encounter as time-barred because the complaint was filed on October 31, 2012, outside the two-year statute of limitations for the October 30 event. The defendants next argue that the evidence is insufficient, as a matter

of law, for a reasonable jury to find that McFadden and Chester County, either directly or indirectly, violated the plaintiff's constitutional rights.  These defendants, however, do not challenge the plaintiff's claim that Guyer violated her Eighth and Fourteenth Amendment rights when he engaged in sexual relations with her while she was incarcerated at the Work Release Center in Chester County Prison.  Plaintiff, in her response, does not argue that either McFadden or Chester County directly violated her constitutional rights.  Plaintiff also does not oppose the dismissal of McFadden in his individual capacity, explaining that she named McFadden only as a final decision maker for Chester County Prison in support of her *Monell* claim.  I will therefore dismiss McFadden in his individual capacity.

Thus, only two issues remain in dispute between the parties: (1) whether any claim stemming from the October 30, 2010 event is time-barred; and (2) whether McFadden in his official capacity and Chester County can be liable, through *Monell*, for Guyer's alleged violation of Minton's constitutional rights.

**A. Statute of Limitations**

All 42 U.S.C. § 1983 claims are subject to the state statute of limitations for personal injury actions.  *Wallace v. Kato*, 549 U.S. 384, 387 (2007).  In Pennsylvania the statute of limitations is two years.  *Sameric Corp. of Del, Inc. v. City of Philadelphia*, 142 F.3d 582, 599 (3d Cir. 1988).  The accrual date of a § 1983 claim, however, "is a question of federal law that is *not* resolved by reference to state law."  *Wallace*, 549 U.S. at 388 (emphasis in original).  A § 1983 cause of action "accrues when the plaintiff knew or should have known of the injury upon which its action is based."  *Sameric Corp.*, 142 F.3d at 599.  "The cause of action accrues even though the full extent of the injury is not then known or predictable."  *Wallace*, 549 U.S. at 391.

The defendants challenge the plaintiff's § 1983 claim stemming from the October 30, 2010 sexual encounter as time-barred. The complaint was filed on October 31, 2012—one day after the two year statute of limitation for the October 30, 2010 event. Plaintiff concedes that the complaint is not timely as to the claim stemming from the October 30, 2010 event; however, she argues that the October 30, 2010 sexual encounter is not time-barred because it was part of a continuing violation.

"The continuing violations doctrine is an equitable exception to the timely filing requirement." *Cowell v. Palmer Twp.*, 263 F.3d 286, 292 (3d Cir. 2001) (internal quotation marks omitted). Under the doctrine, "when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred." *Id.* (internal quotation marks omitted). Although the continuing violations doctrine "has been most frequently applied in employment discrimination claims," the Third Circuit has considered its application in other contexts. *Id.* In determining whether the doctrine applies, a court should consider at least three factors: "(1) the subject matter—whether the violations constitute the same type of discrimination, tending to connect them in a continuing violation; (2) frequency—whether the acts are recurring or more in the nature of isolated incidents; and (3) degree of permanence—whether the act had a degree of permanence which should trigger the plaintiff's awareness of duty to assert his/her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate." *Id.* "The consideration of 'degree of permanence' is the most important of the factors." *Id.* As the Tenth Circuit has explained with reference to the permanence prong, "if an event or series of events should have alerted a reasonable person to act to assert his or her rights

at the time of the violation, the victim cannot later rely on the continuing violation doctrine" to overcome statutory requirements for timely filing.  *Martin v. Nannie and the Newborns*, 3 F.3d 1410, 1415 (10th Cir. 1993).

Here, the plaintiff argues that the violation for purposes of determining the applicability of the continuing violation doctrine is the municipality's "affirmative policy or failure of Defendants to enact a policy when the need for one is obvious."  While *Monell* provides a way to attach municipal liability, the basis for the *Monell* claim is the constitutional violations stemming from the sexual acts on October 30 and 31, 2010.  Accordingly, it is the sexual encounters, and not the municipal policy, from which the court must consider whether there is a continuing violation that would make the complaint timely for any claims arising from the October 30, 2010 sexual act.

The parties split the first and second prongs.  The two violations here are of a similar subject matter, which favors a finding of a continuing violation on the first prong.  However, under the second prong, the incidents are isolated.  Minton alleges two sexual encounters with Guyer during her incarceration.  She alleges no further contact with Guyer while she was incarcerated, and no contact between Guyer and any other inmate.  Two isolated acts do not reach the level of frequency necessary to establish a continuing violation.  Finally, under the third prong, the October 30, 2010 sexual encounter was sufficient to alert a reasonable person to assert her rights at the time of the violation.  A reasonable person knows that sexual contact between an inmate and correctional officer serves no penological purpose, and the sexual act had the degree of permanence sufficient to trigger the awareness of a reasonable person that she had a duty to assert her rights.  Moreover, to make an Eighth Amendment claim, the plaintiff must assert that her sexual encounters with Guyer, while she was incarcerated, caused pain and

suffering sufficient to constitute cruel and unusual punishment.  A reasonable person suffering

from sexual acts that constitute cruel and unusual punishment would be alerted to the necessity

of asserting her rights. The continuing violation doctrine is, therefore, inapplicable to the sexual

acts at issue in this case.

Accordingly, insofar as the plaintiff's claims arise from the October 30, 2010 sexual

encounter, they are time-barred.

### B. Minton's Eighth Amendment Claim Against Guyer[2]

Conditions of confinement that violate "evolving standards of decency" or which

"involve the unnecessary and wanton infliction of pain" are prohibited under the Eighth

Amendment.  *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976).  A prison official violates the

Eighth Amendment when: (1) the deprivation or injury alleged is objectively, "sufficiently

serious"; and (2) the prison official acted with "deliberate indifference" for the inmate's

constitutional rights.  *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

In its motion for summary judgment, the defendants do not challenge either the

sufficiently serious or the deliberate indifference elements with regard to Guyer's violation of

Minton's constitutional rights.  As the issue has not been raised by the defendants, for the

purposes of this summary judgment only, I will assume that the sexual acts alleged are

sufficiently serious for a reasonable jury to find a violation of Minton's Eighth Amendment right

---

[2] Courts have generally held that constitutional violations arising from conditions of confinement raise an Eighth Amendment claim for convicted persons and a Fourteenth Amendment claim for pretrial detainees.  *See, e.g., Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 581 (3d Cir. 2003).  Minton was incarcerated following sentencing on a DUI conviction at the time of the alleged constitutional violations at issue in this case.  (Mot./Resp. ¶ 2.) She therefore raises an Eighth Amendment rather than a Fourteenth Amendment claim regarding her conditions of confinement.  Further, as neither party has briefed an equal protection claim arising under the Fourteenth Amendment, it is waived.  Accordingly, I will grant judgment on the Fourteenth Amendment claim and will proceed only on the Eighth Amendment claim.

to be free from cruel and unusual punishment and that Guyer acted with deliberate indifference

to that right.[3]

### C. Minton's § 1983 Claim Against Chester County Pursuant to *Monell*

Title 42 U.S.C. § 1983 creates liability for any person who, under color of law, deprives a

citizen of "any rights, privileges, or immunities secured by the Constitution."  A municipality

may be a "person" subject to § 1983 liability; however, such liability cannot be premised on the

doctrine of respondeat superior.  That is, a municipality cannot be liable merely for employing an

offending official.  Rather, the plaintiff must "identify a municipal 'policy' or 'custom' that caused

the plaintiff's injury." *Board of the County Comm'rs v. Brown*, 520 U.S. 397, 403, (quoting

*Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978)).  Requiring the plaintiff

to identify a policy "ensures that a municipality is held liable only for those deprivations

resulting from decisions of its duly constituted body or those officials whose acts may fairly be

said to be those of the municipality." *Id.* at 403-04.  However, the policy or custom may be tacit,

---

[3] I do not conclude, as a matter of law, whether the acts alleged in this case are sufficiently serious to raise an Eighth Amendment claim.  There is a dispute among district courts in this Circuit whether unforced sexual contact between a correctional officer and an inmate is sufficiently serious to support an Eighth Amendment claim.  *See, e.g., Carrigan v. Davis*, 70 F. Supp. 2d 448, 454 (D. Del. 1999) (finding that any sexual contact between a correction officer and an inmate, even if consensual, "violates contemporary standards of decency under the Eighth Amendment"); *Stubbs v. DeRose*, No. 03-cv-2362, 2007 U.S. Dist. LEXIS 17830, at *24 (M.D. Pa. March 12, 2007) (finding that "consensual sex between two adults does not constitute cruel and unusual punishment simply because it occurs within the walls of a prison") (citing *Phillips v. Bird*, No. 03-247-KAJ, 2003 U.S. Dist. LEXIS 22418, at *19 (D. Del. December 1, 2003)).  It appears that the Third Circuit has not yet ruled on this issue.

Among other courts, the Eighth and Tenth Circuits have held that consensual sexual intercourse between an inmate and a correction officer does not rise to the level of an Eighth Amendment violation.  *See Freitas v. Ault*, 109 F.3d 1335, 1339 (8th Cir. 1997) (holding that "at the very least, welcome and voluntary sexual interactions, no matter how inappropriate, cannot as matter of law constitute 'pain' as contemplated by the Eighth Amendment"); *Graham v. Sheriff of Logan Cnty.*, 741 F.3d 1118 (10th Cir. 2013) (holding that, given the "overwhelming evidence of consent," the plaintiff's Eighth Amendment rights were not violated.)  The Western District of New York, looking to state law that makes it a crime to engage in sex with a person incapable of consenting, explained that plaintiff's incarceration made her incapable of consenting to sex with the defendant correctional officer, giving rise to a potential constitutional violation.  *Cash v. County of Erie*, No. 04-cv-0182, 2009 WL 3199558, at *2 (W.D.N.Y. September 30, 2009).  And one district court, looking to the power dynamics at play when determining what constitutes consensual sex between an inmate and a correctional officer in an institutional setting, held that the issue is a question of fact not appropriate for summary judgment.  *Chao v. Ballista*, 772 F. Supp. 2d 337 (D. Mass. 2011).

stemming from the municipality's inaction.  As the Supreme Court has explained, a "city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution."  *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011) (citing *Canton v. Harris*, 489 U.S. 378, 395 (1989)) (internal quotations omitted).

In addition to identifying a municipal policy, the plaintiff must also demonstrate that, "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged."  *Id.* at 404 (emphasis in original).  Where, as here, the plaintiff seeks to establish municipal liability on the theory that a facially lawful policy, nonetheless, led an employee to violate a plaintiff's constitutional rights, the plaintiff can establish deliberate conduct by demonstrating "deliberate indifference" on the part of the municipality.  *Canton v. Harris*, 489 U.S. 378, 388-89 (1989).  "[D]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Bd. Of Cnty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 410 (1997).  The plaintiff can demonstrate deliberate indifference through circumstantial evidence, or "by a showing that prison officials simply were aware of a general risk to inmates in plaintiff's situation."  *Beers-Capital v. Whetzel*, 256 F.3d 120, 131 (3d Cir. 2001).  A municipality cannot escape liability merely by arguing that the prison official did not know of the risk to the particular inmate.  *Id.* at 131 (citing *Farmer*, 511 U.S. at 843 (explaining that "it does not matter…whether a prisoner faces an excessive risk….for reasons personal to [her] or because all prisoners in [her] situation face such a risk")).

In their motion for summary judgment, the defendants do not dispute the plaintiff's claims that her constitutional rights were violated when, while incarcerated at Chester County

Prison, she and Guyer engaged in sexual intercourse; that Guyer was acting under color of state law at the time the plaintiff's rights were violated; or that McFadden was the relevant policymaker for the purposes of assessing municipal liability.  Defendants' motion for summary judgment hinges entirely on its argument that the plaintiff failed, as a matter of law, to establish that there was a policy in place that resulted in the violation of the plaintiff's constitutional rights, and that McFadden was deliberately indifferent to the risk that the plaintiff would suffer a violation of her constitutional rights.

The plaintiff argues that the deprivation of her Eighth Amendment right was caused by a Chester County policy or custom, arguing four theories to support her claim: (1) a failure to adequately train correctional officers on policies regarding sexual relationships, or inappropriate contact with inmates; (2) a failure to implement a policy prohibiting correctional officers from supervising opposite-sex inmates, or, at minimum, requiring at least two correctional officers be present for any interactions with the opposite sex; (3) a failure to have an adequate policy requiring pre-employment psychological evaluations of correctional officers; and (4) a failure to adequately investigate claims of sexual harassment and abuse and to adequately discipline correctional officers engaged in inappropriate conduct.  I will address each of these theories separately.

    (1) <u>Failure to adequately train correctional officers on policies regarding sexual relationships, or other inappropriate contact with inmates</u>

The defendants focus the bulk of their argument for summary judgment on the fact that Chester County Prison had an official policy prohibiting sexual relationships between correctional officers and inmates as represented in the General Personnel Orders and the Correctional Officer's Handbook; that Chester County Prison administrators trained its correctional officers regarding this policy; and that Guyer knew of this policy.  The plaintiff

argues, in response that, while Chester County Prison had a written policy, prison administrators failed to adequately train correctional officers, and specifically failed to train Guyer regarding sexual relationships or other inappropriate sexual contact between correctional officers and inmates.

According to Guyer's testimony, which I must accept for the purposes of this motion, he was not instructed on Chester County Prison's policy prohibiting sexual relationships between correctional officers and inmates as part of his initial on-the-job training.  Nor was such instruction a part of his official training at the academy, or any post-academy training.  However, Guyer also stated that he was aware that such a policy existed and had been "taught" by the prison that sexual relationships with inmates were prohibited.  While this testimony does not directly contradict itself, it does raise questions regarding Guyer's training—where and when it might have occurred and what the training might have entailed.  Moreover, plaintiff's expert found that Chester County Prison administrators failed to develop a sufficient training program regarding the policy prohibiting sexual relationships between correctional officers and inmates, failed to instruct Guyer that engaging in sexual relationships with inmates violated the inmates' constitutional, and failed to instruct Guyer that engaging in even unforced sexual contact with an inmate is a criminal violation.  According to plaintiff's expert, the failure to provide such training fell well below accepted standards and practices and was "a moving force" behind the constitutional violation at issue in this case.  After a careful review of the record, and making all inferences in favor of plaintiff, as I must, I find that a genuine question of material fact exists as to whether Chester County Prison administrators adequately trained its correctional officers regarding the policy prohibiting sexual relationships between correctional officers and inmates.

Ordinarily, to establish deliberate indifference on a failure to train claim, the plaintiff must demonstrate a "pattern of similar constitutional violations by untrained employees." *Thomas v. Cumberland Cnty.*, No. 12-3959, 2014 U.S. App. LEXIS 6668, at *12-13 (3d Cir. 2014) (citing *Connick v. Thompson*, 131 S. Ct. 1350, 1360 (2011)).  Such a pattern "puts municipal decisionmakers on notice that a new program is necessary." *Id.* at *13.  However, in some situations, the "need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. *See also*, *Thomas*, No. 12-3959, 2014 U.S. App. LEXIS 6668, at *20 (holding that "a single-incident constitutional violation" can be sufficient to preclude summary judgment where the municipality "fail[s] to provide protective measures and fail safes to prevent mistakes in a situation that occurs frequently") (internal quotations omitted); *A.M. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 575 (3d Cir. 2004) (holding that single-incident constitutional violation was sufficient to survive summary judgment where the likelihood of conflict between juvenile residents was high and the facility offered inadequate training on conflict de-escalation).

Here, while there is no evidence of a pattern of constitutional violations resulting from correctional officers engaging in sexual relationships with inmates,[4] there is evidence that the risk of such constitutional violations was obvious.  Most notably, Warden McFadden's assertion that "good correctional, professional policy" dictates that prisons segregate male correctional officers from female inmates in order to avoid potential sexual harassment issues demonstrates

---

[4] While the plaintiff offers that a pattern of constitutional violations could be established by Guyer's previous misconduct with other employees at Chester County Prison, I am not persuaded by this argument.  The fact that Guyer engaged in an extramarital affair with one employee, and acted inappropriately with a second employee does not evidence a pattern of potential constitutional violations involving sexual relationships between correctional officers and inmates.  Even making all inferences in favor of plaintiff, and therefore assuming that the incidents constituted sexual harassment, prior allegations of workplace sexual harassment would not have put prison administrators on notice that Guyer was likely to engage in sexual misconduct with inmates.

McFadden's subjective knowledge of the risk of sexual misconduct by correctional officers. Furthermore, the risk that correctional officers might engage in sexual relationships with inmates was such that the prison's General Personnel Orders, and the Correctional Officer's Handbook included such relationships among its prohibitions.  Furthermore, the risk that correctional officers would engage in sexual relationships with inmates was sufficient to persuade Pennsylvania legislators to criminalize the act.  From this evidence, a reasonable juror could conclude that the risk of constitutional violations stemming from sexual relationships between correctional officers and inmates was obvious and that McFadden acted with deliberate indifference in failing to properly train correctional officers regarding these potential violations. I find that there remains a genuine issue of material fact as to McFadden's deliberate indifference to the need to adequately train correctional officers regarding the policy prohibiting sexual relationships between correctional officers and inmates.

> (2) Failure to have a policy prohibiting correctional officers from supervising opposite-sex inmates, or, at minimum, requiring at least two correctional officers be present for any interactions with the opposite sex

The plaintiff argues, without response from the defendants, that the policy at Chester County Prison failed to segregate correctional officers from opposite-sex inmates at the Work Release Center, or, at the least, failed to require a minimum of two correctional officers whenever interacting with inmates of the opposite sex.  The plaintiff further argues that the policy provided Guyer with the opportunity to meet with Minton, alone, and to coordinate the sexual encounter with her.  And the plaintiff's expert concluded that "it was bad policy for CCP to allow male guards to be alone and unmonitored with female prisoners" as the practice "jeopardized the safety of female prisoners because the male guard has authority over female inmates…and can direct that inmate to do almost anything he wants."  (Pl. Resp. Ex. R., at 14.)

A reasonable jury could find that McFadden's inaction, in failing to institute a proper policy regarding correctional officers in relation to opposite-sex inmates, created the opportunity that allowed Guyer to engage in sexual intercourse with Minton, in violation of her constitutional rights. [5]  A genuine issue of material fact therefore remains as to whether McFadden's failure to institute such a policy caused a violation of the plaintiff's constitutional rights.

According to the plaintiff, deliberate indifference can be established by McFadden's admission that it was "not good correctional, professional policy" to permit correctional officers to supervise inmates of the opposite sex, despite failing to segregate male correctional officers from female inmates within the Work Release Center.  Because the relevant portion of McFadden's deposition is brief and vital to the analysis, I quote it in its entirety:

> Q.   How about the interaction—from the testimony of former Corporal Dale Guyer, he indicated that in the main prison, men CO's [correctional officers] are assigned to the male wing, female CO's are assigned to the female wing; am I correct about that?
>
> A.   You are correct.
>
> Q.   And—
>
> A.   But let me share with you. I didn't mean to interrupt. We choose to do it that way, but by letter of the law, we can have actually have males oversee females, but because that could create additional issues, we decided not to do that and vice versa.
>
> Q.   And why do you not do that?

---

[5] While not binding on this court, the Second Circuit has held that where plaintiff has established that inmates may be vulnerable to sexual assault or inappropriate sexual contact from correctional officers, a reasonable jury could find that "continued reliance on penal proscriptions alone [are] insufficient to protect prisoners," and additional measures, such as segregating male correctional officers from female inmates, may be required.  *Cash v. County of Erie*, 654 F.3d 324, 337 (2nd Cir. 2011).  In *Cash*, the municipal supervisor acknowledged that he was aware of "highly publicized incidents" of sexual assaults of inmates by correctional officers at other New York correctional facilities, but denied awareness of such assaults at his prison.  The court explained that, even if the supervisor had no actual knowledge of prior sexual assaults at his prison, "it was hardly speculative for a jury to conclude" that the supervisor was aware of the possibility that correctional officers at the prison "were engaging in proscribed sexual contact with prisoners."

> A.  For reasons of possible harassment cases.  It's just not good correctional, professional policy.
>
> Q.  Any other reason?
>
> A.  Whether it be for visual reasons, whether it be for contact reasons, we felt it was best males on males and females on females in the institution.

(McFadden Dep. 36:19-37:17.)

McFadden's statement demonstrates that he was aware that failing to segregate male correctional officers from female inmates "could create additional issues" that could result in "possible harassment cases," and was therefore "not good correctional professional policy." While McFadden does distinguish the atmosphere at the Work Release Center from the main detention center, the distinction is insufficient to explain, as a matter of law, why segregation would be required as good correctional policy in one and not the other.  McFadden offers that the Work Release Center is for "more or less non-violent" offenders, and that it is not as strict as the prison itself.  But he never explicitly states that segregation is not required at the Work Release Center, nor does the distinction of a less strict institution, with less violent offenders, easily explain why segregation would no longer be required to maintain the "good correctional professional policy" that is used at the main detention facility.

This case presents a close question as to how to weigh McFadden's statement to establish deliberate indifference.  But when viewed in the light most favorable to the plaintiff, with all reasonable inferences drawn in her favor, a reasonable jury could find that McFadden, recognizing that it was bad policy to fail to segregate male guards from female inmates in the Chester County Prison main housing unit, was aware of and deliberately indifferent to the need to segregate male correctional officers from female inmates in the Chester County Prison Work

Release Center.  I find that there remains a genuine issue of material fact as to McFadden's deliberate indifference to the need to segregate correctional officers from opposite-sex inmates.

(3) <u>Failure to have a policy requiring pre-employment psychological evaluations of correctional officers</u>

The plaintiff argues, without response from the defendants, that the policy at Chester County Prison failed to require psychological evaluations of correctional officers prior to their hiring.  According to the plaintiff's expert, had Chester County Prison employed a policy requiring pre-employment psychological evaluations, the evaluation would have revealed that Guyer was under psychiatric care and that he "had a long history of extra-marital affairs, disobeying policy and procedures, and engaging in deviant behavior."  Finally the plaintiff argues that defendants' failure to have a policy requiring pre-employment psychological evaluations for correctional officers is "proximately related to the violation of the [p]laintiff's constitutional rights."  While the nexus between a policy requiring pre-employment psychological evaluations and the sexual contact between Guyer and Minton that ultimately led to the constitutional violation at issue in this case seems somewhat tenuous, it is sufficient to survive summary judgment.  *See, e.g., A.M. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572, 581 (3d Cir. 2004) (explaining that as long as the causal link between the alleged policy and the constitutional injury is not too tenuous, the question whether the municipal policy or custom proximately caused the constitutional infringement should be left to the jury) (internal quotations and citation omitted).   As the plaintiff's expert opines, had prison administrators required pre-employment psychological evaluations they would have learned of Guyer's propensities, which may have raised "red flags" cautioning against hiring Guyer as a correctional officer.  Accordingly, a genuine issue of material fact remains as to whether McFadden's inaction in

failing to require pre-employment psychological evaluations caused the violation of Minton's constitutional rights.

According to the plaintiff, deliberate indifference can again be established through Warden McFadden's own deposition testimony.  McFadden stated that if a correctional officer is on "medication that could somehow influence his thought process," such as a "psychotropic medication," that is something "we need to be aware of…for security reasons."  Specifically as to Guyer, McFadden acknowledged that if Guyer was seeing a psychiatrist, or was taking a drug that treated anxiety disorders, such as Ativan, that is "something [that], as the Warden, [McFadden] would want to know about."  Again, McFadden's statements demonstrate his own awareness that, as the Warden, he should have known of the mental health treatment that Guyer received.  And yet, as far as the record indicates, Chester County Prison had no policy, such as a pre-employment psychological evaluation, that would have provided McFadden with that information.  From these statements, a reasonable jury could conclude that McFadden was subjectively aware of the dangers of failing to psychologically evaluate correctional officers prior to employing them, and was deliberately indifferent to that danger.  I find that there remains a genuine question of material fact as to McFadden's deliberate indifference to the need to require pre-employment psychological evaluations for correctional officers.

    (4) <u>Failure to adequately investigate claims of sexual harassment and abuse and to adequately discipline correctional officers engaged in inappropriate conduct</u>

Finally, plaintiff argues that the policy at Chester County Prison failed to adequately investigate, discipline, or report misconduct.  The plaintiff points to two prior incidents of Guyer's alleged sexual harassment of employees at Chester County Prison.  The first incident involved a consensual sexual relationship with a nurse who worked at the prison.  However inappropriate such a relationship might have been, it did not violate prison policy or state law,

and is therefore factually distinct from Guyer's sexual relationship with Minton. The second incident involved no sexual relationship, and the incident report does not indicate that Guyer's misconduct was sexual in nature. These examples of potential workplace sexual harassment are far too attenuated from the facts at issue in this case to demonstrate that the policy at Chester County Prison failed to adequately address sexual misconduct between correctional officers and inmates. The uniqueness of the relationship between correctional officers and inmates that gives rise to plaintiff's claims in this case, likewise distinguishes workplace sexual harassment from institutional sexual assault.

Even if I were to assume that these two prior incidents were sufficiently similar to the sexual misconduct and constitutional violations at issue in Guyer's relationship with Minton, prison administrators did, in fact, address both incidents. In the first, Guyer received a written warning, and in the second he received an official disciplinary report and was required to attend additional training. The fact that Guyer was not fired for the incidents or that they did not appear on his performance review does not demonstrate that prison administrators failed to adequately address or investigate the matters. Furthermore, as soon as prison administrators learned of Guyer's inappropriate contact with female inmates at Chester County Prison, even before they knew of the specific sexual relationship with Minton, they immediately initiated an investigation, reassigned Guyer from the Work Release Center to the main housing unit, and, shortly thereafter, terminated his employment. Accordingly, the plaintiff, as a matter of law, does not provide sufficient evidence to demonstrate that Chester County Prison had a policy that failed to adequately investigate, discipline, or report misconduct similar to the sexual misconduct at issue in this case.

**IV. CONCLUSION**

For the foregoing reasons, defendants' motion for summary judgment will be granted as to: all claims against McFadden in his individual capacity, all claims against McFadden and Chester County under the Fourteenth Amendment, all claims insofar as they arise from the October 30, 2010 event, and the *Monell* claim arising from the failure to adequately investigate and discipline claims of sexual harassment and abuse.  Defendants' motion for summary judgment will be denied as to the *Monell* claims arising from: the failure to adequately train; the failure to segregate correctional officers from opposite-sex inmates; and the failure to require pre-employment psychological evaluations.

An appropriate order follows.